Hear ye, hear ye, Ms. Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Robert D. Claring, presiding.  Now for the 2nd case of the day, case number 2, that's 23-0-0-1-9. William F. Murphy, presiding over the District. William C. Murphy, deceased, plaintiff's appellant. The Honorable Flaherty, Krentz, Loran, Hodge & Masur, P.C. Arguing on behalf of the appellant, Mr. William W. Bill. Also arguing on behalf of the appellant, Mr. Thomas A. Dutria. Arguing on behalf of the appellate, Mr. Daniel Thompson. Thank you. Mr. Bill, you may proceed. Thank you. Good morning. May it please the Court. My name is Mitchell Bild, and along with Tom Dimitrio, Mike Reagan, and Mike Dottori, I represent the estate of Bill Murphy. The primary goal of contract interpretation is to ascertain the true intent of the parties. In 2019, this Court held that paragraph 4E of the 2004 agreement was ambiguous, and that the determination of its meaning is a question of fact. The Court explained that there are two ways that paragraph 4E can be interpreted. On one hand, paragraph 4E did not apply to contingent fees, such as the Seiler case, because that case resulted in a fee that could not have been collected within two months of Bill Murphy's death. And on the other hand, the law firm's view is that paragraph 4E terminated all payments after January 2017. This Court found that both of those interpretations are reasonable. Now, while Bill could not testify on his own behalf, he spoke about his understanding of the contract primarily through two pieces of evidence. A letter he wrote to the executor of his estate, his son, and expert testimony from Joe Power about the industry. Counsel, if the firm's interpretation is correct, could it then avoid having to pay any commission to your estate by delaying any settlement until after Mr. Murphy died? Yes. And on that point, Your Honor, the plaintiff offered the testimony of Joe Power, an expert witness on contingent fees and one of the state's most prominent contingency lawyers. He testified that no contingency fee lawyer, particularly someone who had practiced in the industry for nearly 70 years, would have agreed to limit his payment obligations and the receipt of a fee that was owed to him based on an unrealistic time period. So apparently, if this were real estate law, the attorney would only have a life estate in the partnership? Yes. And moreover, the testimony of Joe Power was not only ignored, but Bill Murphy spoke through the industry customs that Joe Power testified to in his discovery deposition. And at trial, the plaintiff preserved Joe Power's testimony through the form of his discovery testimony as well as his F3 disclosures to show this court exactly why it's important that Bill speak through expert testimony. Bill could speak through expert testimony because the industry custom shows that no lawyer in his position would have agreed to limit it to 60 days after his death. Is the Dead Man's Act implicated in this at all? Although the direct implication is that at trial the plaintiff was granted a motion to eliminate regarding the Dead Man's Act, but the principle behind the Dead Man's Act is that it's supposed to equalize evidence presented by individuals who are alive and individuals who are dead. Does it do that by prohibiting the admission or by expanding the admission? Or both? In my view, it would do both in this case. Although it would limit the evidence, such as any conversations that may have taken place in the presence of Bill Murphy, to the extent that the plaintiff did not open the door to it. But the principle behind the Dead Man's Act shows that the equalizing of evidence is imperative to our justice system. And that's what the plaintiff offered at trial. The trial court barred the 2016 letter from the decedent to his son, stating the view of the 2004 off-house agreement. But it allowed the members of the firm to testify about their own views on the agreement. Was that fair? No. And that is a huge problem that we have proposed. We offered a motion to eliminate number seven, which initially the trial judge agreed to. And motion to eliminate number seven sought to limit the testimony of the law firm's partners to only, to, pardon me, to limit their testimony to not allow them to testify about what they believe they previously intended in 2004. And that's relying on the same rule of law that the trial judge suggested regarding why Bill Murphy's statement in the letter was inadmissible. The trial judge said that that letter was inadmissible because it's a self-serving post-contract statement to try to show prior intent. That's interesting. Weren't the partners' statements at trial just as self-serving as the letter? No, I believe they were more self-serving. The partners' statements at trial were post-litigation. They were aware of a dispute. Bill Murphy's statement in the letter happened nine months before he died. He was simply informing the executor of his estate that he was entitled to a fee in specific contemplation of his death. What else did he have to do in order to earn the fee? Nothing. You're saying it was vested? Yes. The moment that Bill Murphy brought the case to the Connecticut law firm, he complied with everything he was required to do under the contract. The contract required that he exclusively refer cases to the firm without their permission. To the extent that they agreed to let him refer it out somewhere else, that's a different case. But Bill complied with the contract. He complied with the contract in 2012, four years before he died. And the cyber case by the time he died was still not resolved, which highlights the problem that Joe Power's testimony would have informed the jury about. The post-contract statements, would those go to the weight? Yes. Your Honor, our belief is that a post-contract statement, whether self-serving or not, is something that is within the pure province of the jury. The jury could reject it if they don't believe the words or the construction of the words that we present at trial regarding the letter that Bill wrote. They're free to reject it. The problem is that the trial judge is not allowed to evaluate the credibility of evidence on his own. But moreover, even if the trial judge had said that a post-contract statement is okay, the letter itself is conduct. Bill could not have been clearer. In no uncertain terms, Bill told the executor of his estate about a potential asset of his estate. He wouldn't have done that if he didn't truly believe that there was a vested interest in the cyber case even after his death. The letter says nothing about a two-month limitation. The letter says nothing about any other kind of limitation. Because just as Your Honor has mentioned, he had to do nothing else to earn that fee. Let me ask you this. You argue that the trial court abused its discretion by refusing to admit evidence about the firm's representation of the estate during the spring of 2017. The trial court granted the motion in limine because the estate didn't bring any claim for breach of fiduciary duty. So the fiduciary relationship wasn't relevant. No. We believe that it was relevant. On appeal, you argue the evidence of fiduciary relationship was relevant to the breach of contract claim. But I don't see how. Explain how you think it's relevant. So the simpler answer is that it's circumstantial evidence. When the firm wrote a letter in June 2017 to Bill's son, the executive of his estate, offering $150,000, they made a statement to the estate that was wrong. They said that there was no written agreement with Bill. So the letter denying that there was any agreement between the firm, that was admitted, right? Yes. Well, sorry. So the firm at trial, the partners testified that at the time they believed there was no agreement, and even if there were, it had terminated. But the testimony there is all about the credibility of the partner's testimony. Right, right. But it's the most powerful evidence, isn't it, undermining the partner's credibility? Yes. The fact that there was no letter when, in fact, there was a letter. That's right. So then why do you need fiduciary relationship? How does this issue relate to full faith and fair dealing? So to answer both of your questions, the breach of fiduciary duty shows that the partners would not have done anything to breach their fiduciary duties if they were right. If the firm is right in that all payments terminated after January 2017, they would have to say nothing about it, anything, to Bill Murphy. They would not have to say anything to the estate. They wouldn't have to offer $150,000. They wouldn't have to offer quantum merit interest. They would owe nothing. They wouldn't have to say anything to Bill Jr., who he was colloquially referred to at trial. The breach of fiduciary duty is relevant circumstantial evidence to show what really happened behind the scenes. Isn't this evidence, regardless of how it's qualified or denominated, impeaching? Yes. And couldn't it be brought in the nature of cross-examination and questioning relative to whether or not the interpretation that the partners gave were consistent with this communique? Yes. So I don't quite understand why if the motion in limine was granted on a basis that it related to a breach of fiduciary duty, why wouldn't it relate to impeachment? In our view, it relates to both. As a prior inconsistent statement. In our view, it's both. And the trial judge acknowledged in his direct averted ruling that credibility was an issue involving the partner's testimony. He mentioned in his oral ruling that just because the partner's testimony could be impeached doesn't mean that the plaintiff can win. And we disagree with that statement because the credibility of the partner's testimony is crucial to the jury deciding whether they believe the firm or whether they believe the estate. And on that point, the trial judge also mentioned that the plaintiff's evidence offered no alternative. But, Your Honor, the alternative is in this court's opinion in 2019. There are two ways that this contract could be interpreted. Why do you think that the case, if it's remanded, should go to a different judge? The most, the clearest evidence that we have that the trial judge used personal opinions, not opinions that existed in the evidence, not from the testimony. But his personal opinions of the evidence was the statements he made about Bill Murphy's mindset during his direct averted ruling. And in the law firm's brief, they outlined that this was incidental. But that's not so. The trial judge very clearly put his own personal beliefs about what he believes Bill Murphy thought when he wrote a letter to his son and when he agreed to the contract. That did not exist in the evidence. It was not allowed in the evidence. The only individual at trial who was allowed to talk about what Bill actually thought when he wrote the letter, when he agreed to the contract, was the trial judge when he imposed what he believed Bill would have said. That's wrong. And that's why we're asking that this court, in the event of remand, send us to a new trial judge to do this all over again. But if I understand your argument, you want a different judge? Because this judge would probably utilize his own personal opinions in weighing the evidence for purposes of a directed verdict? Yes. Or rulings on virtually anything else? Yes. Our view is that the trial judge's statements in his directed verdict ruling show that everything regarding the trial was tainted based on a personal opinion. And to remove that possibility, we ask that this court remand to a different judge for a new trial. Let me ask you about the HUP problem. Did the HUP agreement include any contingent fee agreements? It did. It was identical. It's a 2004 agreement. And so the termination upon death was essentially what was added? Correct. So there was a termination provision regarding death, partners leaving the firm, the firm dissolving as a corporation, that sort of thing. But then 4E was added as well. But paragraph 4B, which identifies Bill Murphy's interest in the Siler case, remained identical. It was exactly the same. When they created the 2004 agreement, paragraph 4E was designed to solve what has been called the HUP problem. The HUP problem had nothing to do with a contingency fee case. It had everything to do with transactional matters. Specifically, a 50% fee owed to Bob HUP from Fox Valley Park District. Now, that was a continuing billable hour matter that was perhaps an extensive lingering obligation as soon as Bob died. And so they continued to pay the widow. But that's entirely different than what we have here. So essentially because the contingent fee is earned essentially upon referral, whereas the hourly is earned over time as the hours are billed? That's right. And the testimony at trial from the law firm's partners included testimony that there were financial burdens with the contingency fee. But that's just not the case. There may be financial burdens with transactional matters. They may have been paying Bob long after he died on matters they continued to bill. But from the moment the Siler case came in the door and they signed a one-third fee, that ends the story. Bill is entitled to that fee whether he dies or not. Thank you. Do you have any other questions? I do not, thank you. Chris? I have a question. Oh, I'm sorry. I'm sorry to talk to you again. No, that's all right. This says that for rebuttal, Mr. Demetrio will take five minutes. And I assume that means you're going to be taking the remainder of that? Or is Mr. Demetrio going to present rebuttal? Mr. Demetrio will present rebuttal. Okay, so I'm not going to see you again, right, except at the table? That's right. Thank you. Thank you. Mr. Konachek. You may proceed, sir. Good morning, Justices. May it please the Court, Counsel. The decision in this Court that remanded the case back from the 2615E judgment on the pleadings specifically stated that the Court found that there was an ambiguity. So it said if there's an ambiguity, the case then is remanded for one purpose, is to determine the intent of the parties at the time the 2004 agreement was entered into. So when the case goes back to the trial court, and based on the laws, it relates to ambiguity and how you determine intent, we set forth at page 40 of our brief the evidence that would be required. The evidence would be events leading up to the 2004 agreement. The events would be the testimony and the documents in terms of negotiations, emails, exchanges. That would be evidence of pre-contract 2004 intent. Other intent would include the purpose of the 2004 agreement. And then finally, and probably one of the most salient pieces of evidence which existed in this case, was any previous agreement. Justice Kennedy, you asked about that. And in the 19, what we've been calling the 1999 agreement that involved both Mr. Hupp and Mr. Murphy, there was indeed a paragraph relating to the fees from the Park District. And that can be found in paragraph 5 of that agreement. After Mr. Hupp died, the firm, and there was no dispute about this evidence, decided it was time to take care of a problem because there was no termination clause that related to the death of a partner. I'm sorry, to the death of Mr. Murphy or, in the prior instance, Mr. Hupp. They wanted a termination clause, and that was the 6C that you referenced. So there would be an absolute time when the 2004 agreement would terminate so they didn't end up with the problem of having a continuing payment obligation. But there was no fee on a personal injury case on that, in that contract. No, and that's That was just to stop having to pay the spouse monthly. Well, in terms of the Hupp, I thought it was a continued retainer, but that's the point. So if it were just that, Justice Shostak, then the elimination of that paragraph, if you go to paragraph 5 in that 99 agreement, it is eliminated. There is no reference to any further retainer agreement in the 2004, so it's completely inapplicable. They took care of it by that. So in the 2004 agreement, they're now addressing, they're of counsel with Mr. Murphy, and they've realized, like we all do, hopefully, from our past experience, how to address issues. And so under the Pardon me, addressing what issue? Of having Mr. Hupp's problem or Mr. Murphy's problem? No, no problems. There aren't problems of how to terminate or end a relationship. Well, ending a relationship is one thing, but ending a fee agreement is something different, isn't it? It is, and that's why it's addressed in the portion that says under paragraph 4, compensation. And you agreed in the last hearing that we had before you that the firm's interpretation that 4E would cut off any payment under 4A, 4B, and 4C. Each of those paragraphs, Justice, references when fees are collected. That's the operative term in each of those. And if you look at 4A, it is a contingent, just like 4B, matter. It references estates, it references other contingent matters, just like 4B, and it has the same language, that unless the fee is collected, it's not due and owing. So, you know, I understand how some people may look and say, well, geez, you know, why do we have this if it's a contingent fee? Exactly why the firm explained, when you're a firm that doesn't have resources of continued income and you're depending upon these types of personal injury cases to generate money, you have, and this is the testimony uncontradicted, they have to bear the burden of carrying costs. There was testimony that they have to borrow money, the line of credit. There's testimony that they were, the firm is out of pocket in the instance of the Seiler case, $170,000 that the firm has to pay for the secretaries, the copying costs, the rents, all of that. Well, if he were still alive and he was still of counsel and he's still waiting on his retainer fee, they would still have those costs, would they not? That's right. That's absolutely the point. If he's still alive, then it's Mr. Murphy, Judge, Justice, it's Mr. Murphy that receives the money. But it was Mr. Murphy that referred the case, wasn't it? This is not a 1.5 referral. I don't know and care what the referral was. Whether we call it a referral or fee forward, the point is it was Mr. Murphy's if he were alive. That's for sure, okay? I guess I'm going to go back. My point is whether Mr. Murphy is alive or whether Mr. Murphy is dead, what relevance are the costs and the holding, whatever you said, to the firm? I understand. Because in the instance, if they are going to pay out, for instance, to the estate, let's say Mr. Murphy passes away. And he did. And he did. So the issue becomes, in a certain respect, if they are going to bear those costs, bear that burden, paying Mr. Murphy, who's been, as you heard in the evidence, is undisputed a longtime friend of each of those gentlemen sitting back here, that they didn't have a problem about bearing those costs as it related to their friend who brought in the case. Each of them testified, on the other hand, it is not an estate planning document. It is not for the benefit of the heirs. That can't go unnoticed. It was never challenged, and it makes absolute sense, if you're the one, Justice Shostak, then bearing the burden of all those costs. On the one hand, there is a reason why you might do that for your friend, Mr. Murphy, who's been with the firm. On the other, there is an absolute perfect reason why you would want to cut it off so you're not paying heirs in this instance. And that's exactly what the undisputed evidence was in this case. When you sent the case back and we go through the evidence that required pre-contract purpose, events leading up to it, that's what the undisputed evidence was. Well, I don't know that I agree with that. But you argued below that although post-contract conduct is admissible to show the party's intent in a contract, post-contract statements are not admissible. That's right. But the only case that you actually used to support that was at Lexington Insurance. It was a federal case. And the only Illinois case it relied on was Stafranski. And Stafranski didn't actually say that the post-contract statements were an admissible, did it? No. So Lexington cites Stafranski. Right. Which cites Volpe. So the Seventh Circuit. It didn't say per proposition that post-contract statements are admissible. It never said that. Are you saying Stafranski? Yes. Stafranski, the very words that are contained in that opinion reference acts. They say post-contract act, acts. I can't say it. But the other Illinois cases just said post-contract conduct was relevant without mentioning post-contract statements. There is not one Illinois case that says post-contract statements come in. The Seventh Circuit analyzed the very Stafranski case that you are discussing, which discussed the very Volpe case that has been cited in this. Not one case in this jurisdiction says post-contract statements should come in. And the Seventh Circuit had a very good reason because when you're talking about 12 years after the contract, people's statements then could have a self-serving purpose. Now, I want to go back because you pointed out, you said, well, didn't that happen here with the members of the firm? No. No, they did not talk about what they knew at the time of trial in 2023 when this case went to trial. They all referenced the pre-contract purpose. They all referenced the pre-contract HUC. They all referenced the pre-1999. All of the indicia and evidence that is used to determine the intent of the parties. So it's not that they were saying something in 2023, this is my belief. Indeed, not one of them said that. What they said was going back to 2004, this is why, and it was unrebutted evidence as to why. And not only that, it was brought out not by me. I said very little in the course of the trial. It was all brought out by the estate. They brought out the evidence that they now say, oh, it was self-serving. Well, why did you bring it out? The Dead Man's Act, Justice McClaren. Pardon? They brought out stuff that may or may not have been barred by the Dead Man's Act. Not me. All of this information regarding the pre-contract activity came out in the case in chief. Not through me. Post-contract statements should go away, shouldn't they? No, absolutely not. Why not? I completely disagree with that because, as the Seventh Circuit pointed out, and as those state court cases, Zafransky as well as Volpe said, you look, because statements can change, we look at conduct because there, and in Volpe, the conduct was he said that he thought he could build a sign, and the court said, no, wait a minute, you said that. What kind of conduct are you referring to on the part of the partners? There is no, that's the point, that there was no post-contract conduct by anybody that was either offered in an offer of proof or at the trial. All of it was pre-contract. Are you referring to the estates presentation or yours? The estates, Your Justice. So the issue, the question was, why can't statements come in? Because the law doesn't allow it. Well, did I miss something? Was there testimony about the partners indicating what their interpretation was? That was my point, is they went back to the pre-contract time and they discussed the events that occurred. That is the exact type of information. You didn't answer my question. Did they or didn't they? They did not. So there's no testimony in record indicating that they gave their opinion as to what the interpretation of the contract was. They did as of 2004, yes. The reason for doing it, yes, for sure. How could they do it? Oh, you're saying as of 2004, but it was done not during the year of 2004. It was done at the time of trial or during the litigation? Well, that's the only way we got there. So the only way we could present the facts to the… I'm having the dichotomy here, is that you're saying the state doesn't have the ability to present statements, but for some reason the partners do have the ability to present statements. I'm having a problem with the idea that if they can testify 10 years later, not 10 years later, 8 years later or 6 years later, how is this different from what the trial court determined the estate couldn't do? Because their testimony was pre-contract 2004, the events that led up to the agreement. On the other hand, that February 2016 letter that you're referencing that was written by Mr. Murphy, that has… I guess I'm having a problem with the idea that if they are testifying after the fact about what they thought the 2004 agreement was, and Mr. Murphy had a conversation or a letter that indicated that he also was interpreting what the 2004 agreement meant back then instead of at the time he wrote the letter, what is the difference between the two? Because the Exhibit 3, which is the 229-16 letter that you're referencing, does no such thing. Says what? Does no such thing. It does not interpret the contract as of 2004. That letter says nothing about the contract as of 2004. It simply says enclosed is the agreement that we've been working under. We've had no problems with this. In the event of my death, however, there are two cases which I have an interest. There is no reference to paragraph 4E, 4B, or 6C. So it's not an interpretation. It's not an opinion or anything about that. Counsel, I guess we're going to have to disagree because I don't believe that I've experienced a case when somebody was talking about a contract, especially in general terms, that they started referencing specific paragraph numbers such that opposing counsel sometime later could suggest that they did or they didn't reference the paragraphs upon which the agreement was based. But that's why this Court sent it back in the opinion. It said we are talking about 4E and its relationship to 4B and its relationship to 6C. That was the direction from this Court. And that letter says nothing and has nothing to do with that. Can I make one last point? You're looking at an elephant through a microscope is the way I'm picturing this. Your time is up, by the way. Do you have any other questions? I do. I have one question, and you're probably going to disagree with me on introduction of this, but the trial court barred the plaintiff from introducing the 2017 e-mail exchange between Mr. Hodge and the estate's executor to show the firm's knowledge that the executor was asking for the Seiler case or asking about the Seiler case. But weren't those e-mails at least somewhat relevant to show the knowledge, especially during the timing? If you look at the 2017 with Mr. Hodge, the e-mail was April of 2017, and it was in response to what Mr. Murphy was asking him about two matters. It did not have a request or even discuss anything about the contract, Your Honor. And the reason that that e-mail was going to be used, as you've already discussed here, and the sole purpose was to say there was a breach of fiduciary duty of which there was never a claim of breach of fiduciary duty. It was not offered for the purpose or to suggest that there was a distinction between 4E, 4B, and 6C, and there's nothing even mentioned about that  in the e-mail. Can I raise one last issue? I have, Chris, do you have any? No, I don't. I commented with Mr. Bild and suggested that possibly the communique relative to the payment of $150,000 was a prior inconsistent statement with the general interpretation or statement by the firm suggesting that upon the death of Mr. Murphy, that the firm didn't owe any more money whatsoever, let alone $150,000. So I'm looking at the representations that have been made relative to the termination of any liability for any payments whatsoever with the inconsistent statement made therein and referenced. And how do you reconcile those two, if you can? Yes. So the reference that was made in the letter that was sent on June 30, 2017, specifically the interest reference related to a quantum merit. Quantum merit is amount of money that is owed if there is no contract. And it's been the firm's position from the beginning is that there is no contract, so if you have no contract, the law allows under equity quantum merit. That's exactly what that letter says. So that was what the $150,000 was? Yes, Your Honor. Where in the agreement does it even mention a Latin term remotely similar to quantum merit? Well, that's the point is that it wouldn't because if there is no contract, then equity kicks in and says, well, if somebody did something and there is no contract, whether it's by virtue of being null and void, by virtue of being thrown out by a court, that you are allowed for the time that you put into the case, and that's the purpose of that letter. The problem I'm having with your response is that quantum merit suggests the contract doesn't exist, and the communique suggested that the contract did exist. So can you reconcile the discrepancy or the differences, the distinguishing factors between quantum merit based upon no contract as opposed to no fee based upon the interpretation by the firm that upon the death of Mr. Murphy, the firm was no longer liable for anything? Right. So the June 30th specifically says, the letter you're referencing specifically says there is no agreement. That was prior to finding it. It was misfiled. That's right. And it was also based on the interpretation that the contract terminated upon death. So, yes. So the point is that there is no contract. Well, but it can't be both, though. That's right. So the letter, the timing of the letter you're referencing, you're saying that's because the firm hadn't found the document at that point. That's correct. And Mr. Major, who wrote the letter, was told by Mr. Canale, based on the evidence, is that the contract, that there was no agreement. So there was some agreement, but it wasn't? Correct. All right. Thank you. Thank you. Mr. Demetrio, you may proceed. May it please this Court, I think I'll start at the end, which I really don't know where to start. But I would like to say that Mr. Hodge, who authored 4E, like the other partners who were consulted prior to this June letter going out to Mr. Murphy, their client, as to if they're okay with it. Can you be okay with the $150,000? And Mr. Hodge signed off on it. And before that letter went out, Mr. Hodge, the author again of 4E, read the agreement. He read it. So the agreement was in the office because he read it. Later, we were told it was found in a drawer someplace where Mr. Loren had his mother's legal matters. But nevertheless, that agreement was well known to this firm before that letter went out in June. And this jury would have been instructed on the credibility of witnesses. It's up to them. And any bias, any interest is up to them to judge. The men are well testified. Yes, I brought out at trial what their version of things were as of 2004. Why? Because the judge said he was going to allow it. I'm a trial lawyer, and I wasn't going to let this jury hear it from the defense. So I brought it out. But with respect to, look, if Robinson Caruso is wandering around this island, and he believes he's the only one there, until one day, he sees footsteps in the sand. And all of a sudden, he knows he's not the only one on that island. And our trial judge did not understand, did not grasp the importance of circumstantial evidence. And there was a lot of it. Should the letter that the son had been admitted, yes, it should have. And going to one of the questions, that letter states categorically, no two-month cap here, son. In the event of my death, I'm entitled to one-third of that fee, as he was. You weren't allowed to put that letter in, correct me if I'm wrong. We were not. We were not. But the members of the firm testified as to their views of that agreement. Because the judge allowed it. We did this pre-trial. We had a motion to eliminate, to borrow, as Mitch pointed out. But this judge, I mean, Mitch gave you a couple of reasons why, if this does go back, why we do not want to go back to this judge. Because instead of grasping the importance of circumstantial evidence, the footsteps in the sand. And again, there was a lot of it. Bill Murphy was 84 years old in 2004 when this agreement was entered into. And if he had brought in the Siler case in 2004 and dropped dead the next day, nobody would be shocked at that at age 84. He knew what he was doing because, Justice Kennedy, the 1999 agreement on contingent fees, one-third, remained the same in the 2004 agreement. The 2004 agreement was to solve the Huck problem. And the contingency fee lawyer, one of them in the firm, Mr. Connelly, went to the transactional lawyer in the firm, Mr. Huck, with the directive, solve, I mean, Mr. Houch, with the directive, solve the Huck problem. And that's what 4E does. In the context of solving the Huck problem, is the interpretation and the law of the case that the terms are, or that the contract is ambiguous is wrong and that there's only one clear interpretation, which is consistent with resolving the Huck problem? No, I believe that this court got it right and that there are two reasonable explanations, interpretations. And that's why a jury should determine this. Instead of this judge taking it away from us, not letting the jury consider the circumstantial evidence, but instead, and I'm going to use my last minute, I guess, to emphasize, because this is a quote from the judge's rule regarding our position that 4E did not apply to a contingency case because none of us in our business know when a case is going to settle. And even if it settles, when the money is going to actually come in. Well, Mr. Demetrio, let me interrupt you. How about having to carry that cost of that case? Well, that's what we do. That's what plaintiff lawyers do. We cover the cost. I don't know what all the chatter was about. We have to keep the lights on. We have to pay salaries. So what? Take Bill Murphy's $777,777 to do that? Is that what this was all about? We need Bill's third fee that he was entitled to. This wasn't estate planning. Referring lawyers die all the time. Plaintiff lawyers pay their estate. I think the rationale was more on point that the heirs shouldn't benefit from the fees that were vested in Mr. Murphy while he was alive. Yeah, well, that's the way it works. Estates. Estates. Do you have any questions? Can I make this point? You can close, but before you close, I ask if they have any questions. Because if they do, then we'll deal with questions and answers. And then when there are no more questions and answers, then you can close. Okay. You don't, and she doesn't. If you close, then please, because I've asked quite a lot of questions already. Well, the point I want to make first is that at 84 years old, it's ridiculous to think Bill Murphy signed this agreement, and when a potential almost million dollar one-third fee was out there in the world someday potentially, he'd say, yeah, but only if it's collected within two months. That's just ridiculous. Of his death. Yes. The quote is this. Again, regarding our position, 4E did not apply, and that 4B was what should have controlled it. This judge said, quote, I knew Mr. Murphy. I know that he would never think such a thing. That's what this judge knew about Mr. Murphy. Quote, later in his later life, having at age 90, realized how lucrative the Siler case had become, and then suddenly rethought what he thought his interests should be. Where does this come from? First of all, the Siler case didn't even come into the office until Mr. Murphy was 91 years old. Quote, I'm not surprised that Mr. Murphy, at age 90, when he realized what the Siler case was worth, thought to himself, maybe that agreement wasn't as good of an agreement as I thought. End quote. That's what we were facing. That's why he granted a directed verdict at the end of the plaintiff's case. Because he knew the thought process of this by all accounts. The most brilliant lawyer with the most beautiful mind these lawyers in the firm ever knew. So, you know, I was happy with my friend to take on this matter, Cobalt, by the way, because every nickel of it belongs to this estate. If there is a trial someday, and we are successful. Because Bill Murphy was a smart guy. And when he wrote that letter to his son in February, handwritten, by the way, meticulous handwriting. Emphasizing the one third fee that he was entitled to. He knew, he knew that at age 95, which he was at the time, he might die. And that's why he went out of his way to let his son, who is also a lawyer, an executor, know what he should be looking out for. And that's why when this April email was written, what's the status of the Siler case, Mr. Hodge is saying, instead, what's the matter to you, Bill Murphy? Why do you care about the Siler case? He says, I think it was continued to the fall. If I'm wrong, I'll get back to you. Circumstantial evidence that he knew there was an interest in the Siler case. That circumstantial evidence, where the 99th agreement, same as the 204 agreement on contingent fee matters. The Messure letter, with all the inconsistencies. Circumstantial evidence. At any rate, we'll take the case under advisement. We have another case on the call. Thank you, it's been a very interesting case.